UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| SUSAN B. NISSENBAUM, individually, | ) |
| Plaintiff, | ) |
| v. | ) 3:11-CV-00253-LRH-WGC |
| NNH CAL NEVA SERVICES CO., LLC, a Delaware Limited Liability Company; NAMCAL, LLC, a Nevada Limited Liability Company, d.b.a., THE CAL NEVA RESORT SPA & CASINO; NAMWEST, a Nevada Limited Liability Company; SENTRY HOSPITALITY OF NEVADA, a Foreign Limited Liability Company; CANYON CAPITAL REALTY ADVISORS, a Foreign Corporation; CANPARTNERS REALTY HOLDING COMPANY IV, LLC, a Delaware Limited Liability Company; and DOES I-XX, Defendants. | ) ORDER |

Before the Court is Defendants NHH Cal Neva Services Co., LLC's ("NHH") Motion for Summary Judgment. Doc. #72.[1] Plaintiff Susan B. Nissenbaum ("Nissenbaum") filed an Opposition (Doc. # 78), to which the Canyon Entities replied (Doc. #79).

**I.    Factual Background**

This case concerns Nissenbaum's employment at the Cal Neva Resort, Spa and Casino (the "Cal Neva") in Lake Tahoe, California and Nevada. Nissenbaum began work at the Cal Neva as an

---

[1] Refers to the Court's docket number.

employee of Sentry Hospitality of Nevada ("Sentry") on February 16, 2005. *See* Doc. #73, Ex. 3; *see also* Doc. #73, Ex. 2. At that time, the Cal Neva was owned by Namcal, LLC ("Namcal"). *See* Doc. #73, Ex. 3. Pursuant to the Management Agreement between Namcal and Sentry, dated February 15, 2005 (the "Management Agreement"), Sentry was the manager of the Cal Neva. Doc. #73, Ex. 2. On November 6, 2007, Canpartners Realty Holding Company IV, LLC's ("Canpartners") made a $25,000,000 loan (the "Loan") to Namcal. *See* Doc. #73, Ex. 1 (Bosworth Dep.), p. 107; *see also* Doc. #73, Ex. 4. The Loan was secured by the Cal Neva property. *See* Doc. #78, Ex. 5. In order to secure repayment of the Loan, Namcal executed and delivered to Canpartners various security instruments, as is customary in commercial real estate lending practice. *See* Doc. #72, p. 6; *see also* Doc. #78, p. 2. Of particular relevance here, Namcal and Canpartners executed an Assignment of Management Agreement, Security Agreement and Subordination Recognition Agreement (the "Subordination Agreement"). Doc. #73, Ex. 4. In December, 2008, following Namcal's default on the Loan, Canpartners recorded a Notice of Default and Election to Sell under the California and Nevada Deed of Trust. *See* Doc. #72, p. 8. Thereafter, Canpartners sought the appointment of a receiver to oversee management and control of the Cal Neva until the time of foreclosure. *See* Doc. #73, Ex. 1 (Bosworth Dep.), pp. 77-78; *see also* Doc. #78, Ex. 8 (Canpartners' Motion for Appointment of Receiver). On February 5, 2009, Michael McPherson ("McPherson") was appointed by the Washoe County District Court to act as Receiver of the Cal Neva. Doc. #74, Ex. 9. The receivership order granted McPherson broad authority to "take possession of the [Cal Neva] and hold, manage, and maintain [it] . . . , preserving it from loss, material injury, destruction, substantial waste, or loss of income therefrom." *Id.* at 2.

      On April 8, 2009, Canpartners foreclosed on the Cal Neva, and its subsidiary, Canpartners Cal Neva, became the new owner through trustee sales conducted in both California and Nevada. *Id.* at 183; Doc. #74, Ex. 10. Later that same day, pursuant to its rights under the Subordination Agreement, Canpartners terminated the Management Agreement between Namcal and Sentry, effective April 9, 2009. Doc. #74, Ex. 10. Also on April 8, 2009, Canpartners Cal Neva and NHH

1  executed the Amended and Restated Management Agreement (the "NHH Management
2  Agreement"), pursuant to which NHH took over management of the Cal Neva.  Doc. #74, Ex. 11.
3  On April 9, 2009, Ernie Catanzaro ("Catanzaro") of NHH sent a letter to William Jackson
4  ("Jackson") of Sentry, then General Manager of the Cal Neva, informing him that NHH would not
5  be retaining him or Nissenbaum.  Doc. #74, Ex. 12.
6        Also on April 9, 2009, Catanzaro and Robert Marcil ("Marcil"), both representatives of
7  NHH, visited the Cal Neva to prepare for the transition in management from Sentry to NHH.  *See*
8  Doc. #73, Ex. 8 (Nissenbaum Dep.), p. 190 (explaining that the visit was to facilitate the
9  transition).  On that same day, Marcil briefly interacted with Nissenbaum, asking several human
10 resource related questions and gathering some human resource materials.  *See id.* at 190-91.  Also
11 on April 9, 2009, both Catanzaro and Marcil informed Nissenbaum that she was no longer
12 employed at the Cal Neva.[2]  *See id.* at 191-92.  NHH officially took control of the Cal Neva on
13 April 10, 2009, at midnight.  *See* Doc. #78, p. 7 (Nissenbaum conceding that "the parties
14 affirmatively decided the [NHH] Management Agreement would be effective on [sic] April 8,
15 2009, and that NHH Cal Neva would officially take physical control of the property on April 10,
16 2009, a minute after midnight").
17       On April 3, 2009, Nissenbaum, through counsel, sent a letter to various representatives
18 from Namcal, Sentry, and others, complaining of gender discrimination, unequal pay, and
19 demanding payment for lost wages.  Doc. #75, Ex. 16.  The letter was not addressed to any
20 representative of NHH.  *See id.*  On April 10, 2009, Nissenbaum filed a complaint with the Nevada
21 Equal Rights Commission, alleging violations of Title VII of the Civil Rights Act of 1964 ("Title
22 VII") and the Equal Pay Act of 1963 ("Equal Pay Act").  *See* Doc. #27, ¶50.  Nissenbaum's

---

[2] Nissenbaum does not recall whether Catanzaro and Marcil used the phrase "you're being terminated" or "you're not being rehired."  *See* Doc. #73, Ex. 8 (Nissenbaum Dep.), p. 192. Nevertheless, the Court finds the discrepancy immaterial to the determination of whether NHH was Nissenbaum's employer or joint employer.

3

complaint was subsequently forwarded to the United States Equal Employment Opportunity Commission (the "EEOC").  *See generally id.*  The EEOC ultimately terminated its investigation on both claims without issuing any findings of fact or conclusions of law.  *See id.* at ¶51, ¶52.

On December 20, 2011, Nissenbaum, through prior counsel, filed a First Amended Complaint ("FAC"), naming NHH as a defendant.  *See id.*  In the FAC, Nissenbaum alleges two causes of action—the first for equal pay discrimination in violation of the Equal Pay Act, 29 U.S.C. § 206(d)(1), and Nevada's Equal Pay Act, N.R.S. 608.017, and the second for discrimination in violation of Title VII, 42 U.S.C. § 2000e-2, and Nevada's anti-discrimination statute, N.R.S. 613.330.  *See id.* at ¶¶53-74.  In addition to compensatory damages, Nissenbaum also seeks punitive damages against NHH.  *See id.* at pp. 16-17.  On May 3, 2013, NHH filed the present Motion for Summary Judgment on the issue of joint employer liability.  Doc. #72.

**II.    Legal Standard**

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, affidavits or declarations, stipulations, admissions, and other materials in the record show that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the initial burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party."  *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).

4

On an issue as to which the non-moving party has the burden of proof, however, the moving party can prevail merely by demonstrating that there is an absence of evidence to support an essential element of the non-moving party's case. *Celotex*, 477 U.S. at 323.

To successfully rebut a motion for summary judgment, the non-moving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a scintilla of evidence in support of the party's position is insufficient to establish a genuine dispute; there must be evidence on which a jury could reasonably find for the party. *See id.* at 252.

**III.    Discussion**

    **A.    Joint Employer Status Under the Fair Labor Standards Act**

The Fair Labor Standards Act ("FLSA")[3] prohibits employers from discriminating between employees on the basis of sex. *See* 29 U.S.C. § 206(d)(1). To succeed on a claim under the FLSA, a plaintiff must first establish the existence of an employer/employee relationship. *See Bonnette v. Cal. Health and Welfare Agency*, 704 F.2d 1465, 1468 (9th Cir. 1983), abrogated on other grounds by *Garcia v. San Antonio Transit Auth.*, 469 U.S. 528, 539 (1985); *see also Martinez-Mendoza v. Champion Intern. Corp.*, 340 F.3d 1200, 1209 (11th Cir. 2003) (alleged employee has the burden of proving joint employment by a preponderance of the evidence). The FLSA defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The FLSA defines an "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). Under the FLSA, two or more employers may employ a

---

[3] The FLSA encompasses the Equal Pay Act. *See generally* 29 U.S.C. § 206.

person jointly. *Bonnette*, 704 F.2d at 1469; 29 C.F.R. § 791.2(a). Where joint employment is found, each joint employer is individually responsible for violations of the FLSA with respect to the entire employment. *Valdez v. Cox Communications Las Vegas, Inc.*, No. 2:09-CV-01797-PMP-RJJ, 2012 WL 1203726, at *1 (D. Nev. April 11, 2012) (citing *Bonnette*, 704 F.2d at 1469; 29 C.F.R. § 791.2(a)). "A fundamental principle behind the joint employment doctrine is that a worker may be employed by more than one entity at the same time." *Guifu Li v. A Perfect Day Franchise, Inc.*, 281 F.R.D. 373, 400 (N.D. Cal. 2012) (citing *Bonnette*, 704 F.2d at 1469; *Gilbreath v. Cutter Biological, Inc.*, 931 F.2d 1320, 1324 (9th Cir. 1991)).

The Court applies an "economic reality" test to determine whether a joint employment relationship exists. *Torres-Lopez v. May*, 11 F.3d 633, 638 (9th Cir. 1997). Among the factors the Court considers most relevant when evaluating the economic reality of an alleged joint employment relationship are "whether the alleged employer (1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of payment, (3) determined the rate and method of payment, and (4) maintained employment records," (collectively referred to as the "*Bonnette* factors"). *Moreau v. Air France*, 356 F.3d 942, 946-47 (9th Cir. 2004) (quoting *Bonnette*, 704 F.2d at 1470). However, no single factor is dispositive—the Court may ultimately conclude that there was no joint employment, even where some factors weigh in favor of finding joint employment. *Zheng*, 355 F.3d at 76. "Ultimately, the determination is 'based upon the circumstances of the whole activity.'" *Valdez*, 2012 WL 1203726, at *2 (quoting *Bonnette*, 704 F.2d at 1470).

Whether a party is an employer for purposes of FLSA liability is a question of law, appropriate for resolution by the Court on motion for summary judgment. *See Torres-Lopez*, 111 F.3d at 638. In order to find no joint employment at the summary judgment stage, the Court "would have to conclude that, even where both the historical facts and the relevant factors are interpreted in the light most favorable to the plaintiffs, defendants are still entitled to judgment as a matter of law." *Zheng*, 355 F.3d at 76.

Nissenbaum admits, and NHH does not dispute, that she was employed by Sentry. *See* Doc. #75, Ex. 17, ¶1; Ex. 18, ¶1; *see also* Doc. #78, p. 2.  However, she also asserts that NHH was also her joint employer, "albeit for a very short time, because of its role as Canpartners' management company for the Cal Neva[.]" *See* Doc. #78, pp. 4.  Nevertheless, Nissenbaum's analysis of the joint employer issue falls woefully short of demonstrating that NHH exercised any control over her employment at the Cal Neva.  Instead of refuting NHH's detailed analysis of the joint employment issue under the aforementioned framework, Nissenbaum cites an EEOC Enforcement Guidance document as providing support for her position. *See* Doc. #78, pp. 6-12.  The Court, however, is unpersuaded by her "alternative" analysis.  First, Nissenbaum's status as either an employee or an independent contractor is entirely irrelevant to a determination of whether NHH was her joint employer. *See* Doc. #78, pp. 7-10 (arguing that Nissenbaum is an "employee" rather than an "independent contractor"); *see also* Doc. #79, p. 12 (NHH willingly admits that Nissenbaum was not an independent contractor, but instead an employee of Sentry).  Second, the relevant inquiry under the EEOC Guidance as to NHH's alleged joint employer status is *still* whether NHH had the right to exercise control over Nissenbaum's employment. *See* Doc. #78, p. 10.  Accordingly, *Bonnette* sets forth the appropriate legal framework.

Without addressing the *Bonnette* framework, Nissenbaum cites the fact that the NHH Management Agreement has an effective date of April 8, 2009 (though she admits that NHH did not take control of the Cal Neva until April 10, 2009). Doc. #78, p. 11; Doc. #78, Ex. 10.  She further avers that "NHH Cal Neva . . . began their work long before they assumed their official capacities, and [that] there is no support for NHH's Cal Neva's assumption that its actions in an official capacity are the only actions, or the only time frame, that may be considered." Doc. #78, p. 12.  While the Court agrees with Nissenbaum's premise that consideration of NHH's actions should not be limited to only those official actions taken after it assumed control of the Cal Neva, Nissenbaum still failed to proffer any evidence indicating that NHH had the right to control, or did actually control, Nissenbaum's employment.

7

**B.     The *Bonnette* Factors as Applied to NHH**

(i)   The Power to Hire and Fire

While Nissenbaum claims that she was terminated by Catanzaro and Marcil of NHH, the record is entirely devoid of any indication that NHH had the authority to do so. Section 4.2 of the Sentry Management Agreement expressly provides:

> Employees. (a) [Namcal] hereby grants to Sentry the right to hire, promote, discharge and supervise the work of management staff (i.e., the hiring of the assistant managers and department heads) as well as all other operating and service employees performing services in or about the Hotel/Resort (other than spa and casino employees), all in Sentry's name or in the name of Sentry's Affiliate. All Executive Committee Members shall be employees of Sentry. [Namcal] retains the right to approve the hiring and/or termination of the general manager and controller.

Doc. #69, Ex. 4, p. 14. Pursuant to these terms, Sentry had the exclusive authority over hiring and termination decisions and Namcal retained only the limited right to approve the hiring and termination of the general manager and controller. *See id.* At the time of her termination, Nissenbaum was in the position of Hotel Manager, not General Manager. *See* Doc. #71, Ex. 17. Accordingly, only Sentry had the right to terminate her employment. Consistent with this fact, Nissenbaum points out that "[NHH] provided a letter to Sentry indicating [Nissenbaum] would not be retained, [but] there is no evidence that suggests the letter was provided to Nissenbaum." Doc. #78, p. 4. Indeed, NHH's efforts to provide Sentry the letter, but not Nissenbaum, are completely consistent with the fact that NHH had no authority to terminate Nissenbaum. Moreover, Nissenbaum appears to acknowledge that NHH did not control her termination as she testified that she does not blame NHH for "the effects personally of being terminated." *See* Doc. #73, Ex. 8 (Nissenbaum Dep.), p. 202.

To the extent that NHH had the authority to hire Nissenbaum, it chose not to, and thus did not become her employer. *See* Doc. #74, Ex. 12. Following the foreclosure proceedings on April 8, 2009, Canpartners terminated the Management Agreement between Namcal and Sentry, effective

///

///


April 9, 2009.[4]  Doc. #74, Ex. 10.  Accordingly, Nissenbaum's employment by Sentry at the Cal Neva was automatically terminated on April 9, 2009.[5]  Thereafter, Canpartners and NHH executed the Amended Management Agreement, effective April 8, 2009.  Doc. #74, Ex. 11.  As the new management company, NHH had the authority to hire her as an employee at the Cal Neva as early as April 8, 2009 (the effective date of the NHH Management Agreement), but chose not to.  *See* Doc. #74, Ex. 11, Section 3.3; *see also* Doc. #74, Ex. 12.  Nissenbaum's bare assertion to the contrary is entirely unsupported by the evidence.  *See* Doc. #73, Ex. 8 (Nissenbaum Dep.), p. 193 (Nissenbaum testifying that she worked for NHH for two days—April 8, 2009 and April 9, 2009).  Most telling in this regard is the fact that Nissenbaum never filed out any employment paperwork with NHH, including an I-9, which is required for employment to begin.  *See* Doc. #74, Ex. 13 (various payroll documents from NHH, none of which concern Nissenbaum).

         (ii)    Supervision and Control Over Employee Work Schedules or Conditions of Payment

Section 4.2 of the Management Agreement explicitly granted Sentry the exclusive right "to supervise the work of management staff . . . as well as all other operating and service employees performing services in or about the [Cal Neva]."  Doc. #73, Ex. 2; *see also Gilbreath v. Cutter Biological, Inc.*, 931 F.2d 1320, 1326-27 (finding that defendant was not a joint employer of inmate workers where the contract between defendant and the department of corrections vested ultimate supervisory authority with the state).  Accordingly, during Nissenbaum's employment with Sentry at the Cal Neva, which lasted until April 9, 2009, only Sentry had the authority to supervise and control her employment.  Additionally, the record is completely devoid of any evidence that NHH actually did exercise any supervision or control over Nissenbaum's employment.  To the contrary,

---

[4] The Subordination Agreement explicitly gave Canpartners the right to terminate Sentry as the hotel management company upon a loan default by Namcal.  *See* Doc. #73, Ex. 4, Section 5.

[5] This is not to say that Nissenbaum's employment with Sentry was automatically terminated.  Rather, because Sentry no longer managed the Cal Neva, Nissenbaum no longer had employment with Sentry there either.

1 the evidence strongly suggests that NHH played absolutely no role in supervising or controlling
2 Nissenbaum's employment whatsoever.  Nissenbaum does not allege that she reported to NHH
3 regarding her job responsibilities, that NHH gave her job assignments or directed her day-to-day
4 activities, that NHH completed any written evaluations of her, that she ever negotiated her salary
5 with NHH or any representative on NHH's behalf, or that NHH ever had any involvement in the
6 payroll process.  Nor did Nissenbaum complain about the hours she was working or her salary to
7 any representative from NHH.  *See* Doc. #73, Ex. 8 (Nissenbaum Dep.), p. 190-191 (testifying as to
8 the very brief encounter she had with Catanzero and Marcil of NHH on April 9, 2009).

9       Finally, the date on which Canpartners began searching for a management company to
10 replace Sentry has no bearing on the Court's analysis.  Indeed, the evidence indicates that
11 Canpartners was in contact with NHH and others in preparation for the transition in management
12 before the date on which NHH officially took over management of the Cal Neva.  *See* Doc. #78,
13 Ex. 9; Doc. #78, Ex. 11; Doc. #78, Ex. 2 (Nissenbaum Dep.), pp. 189-90 (testifying as to an
14 encounter with Marcil, human resources representative from NHH, in which he asked Nissenbaum
15 where to find certain things and other questions about the property); *see also* Doc. #73, Ex. 1
16 (Bosworth Dep.), pp. 185-86 (testifying that NHH began working for Canpartners on April 8, 2009
17 in anticipation of its assignment to the Cal Neva, but noting also that NHH did not run the property
18 at that time).  Bosworth went to great lengths to explain in his deposition that "you can have a
19 management agreement in place with a hotel management company 90 days before they take
20 over... because they're going to be preparing."  Doc. #73, Ex. 1 (Bosworth Dep.), pp. 185-86.  The
21 fact that NHH, by virtue of the NHH Management Agreement with Canpartners, was preparing for
22 this transition in management simply does not indicate that NHH exercised any supervision or
23 control over Nissenbaum during that time.

24       Nissenbaum's averment that NHH "was acting on behalf of Canpartners as early as April 3,
25 2009" is misleading at best.  *See* Doc. #78, p. 11.  The email to which Nissenbaum refers as
26 "evidence" is between two NHH employees regarding general questions to ask at some future time.

10

*See* Doc. #78, Ex. 11, p. 253. It has nothing to do with Nissenbaum and certainly does not substantiate her assertion that NHH was acting on behalf of Canpartners or that NHH had any supervisory or economic control over Nissenbaum's employment at that time. *See id.* The Court is similarly unimpressed by Nissenbaum's false assertions that "NHH was hard at work on the Cal Neva as early as October, 2008; NHH was then already identified as 'in charge' of the Cal Neva property, and involved in budgeting and setting drink prices," and that "NHH has been actively involved in the Cal Neva with Canpartners since October, 2008; long before their formal agreement was in place, and even before the default occured." The emails to which Nissenbaum refers are dated October and December 2009, long *after* NHH officially took over management of the Cal Neva. *See* Doc. #78, Ex. 11.

          (iii)    Determination of the Rate and Method of Payment

Again, the evidence clearly reflects that NHH played absolutely no role in determining the rate and method of Nissenbaum's compensation. *See* Doc. #74, Ex. 13 (documenting NHH's payroll register between April 10, 2009 and July 10, 2009). In fact, Nissenbaum admits that she never received any type of compensation from NHH. *See* Doc. #73, Ex. 8 (Nissenbaum Dep.), pp. 193, 196. Moreover, each of Nissenbaum's paystubs in the 2008 calendar year, as well as her final paystub dated April 9, 2009, identifies Sentry as her employer and Paychex, Inc. as the third-party payroll company used by Sentry for payroll processing. *See* Doc. #73, Ex. 7. Additionally, Compensation Reports from January 1, 2006 through April 17, 2009, show Sentry as Nissenbaum's employer. *See* Doc. #73, Ex. 5. Nissenbaum's W-2 forms from this time period also reflect that Sentry was her employer. *See* Doc. #73, Ex. 6.

Nor does Nissenbaum present any other evidence to establish that NHH was at all involved in the changes to her positions or salary while employed at the Cal Neva. Rather, the Personnel Action Forms, submitted with the Canyon Entities Motion for Summary Judgement, documenting Nissenbaum's promotions and demotions, and the accompanying changes to her salary, were in the name of and issued by Sentry. *See* Doc. #71, Ex. 15 (documenting Nissenbaum's promotion to

11

1 General Manager and increase in pay rate); Doc. #71, Ex. 16 (documenting a retroactive salary
2 increase); Doc. #71, Ex. 17 (documenting Nissenbaum's demotion to Hotel Manager and decrease
3 in pay rate).

        (iv)    <u>Maintenance of Employee Records</u>

Finally, the record is entirely devoid of any evidence that NHH kept any records related to Nissenbaum's employment during her tenure at Cal Neva. Rather, all of Nissenbaum's employment records during the relevant period were maintained by either Namcal or Sentry. *See* Doc. #73, Ex. 3 (Nissenbaum's application for employment with Namcal); Doc. #73, Ex. 5 (Nissenbaum's compensation reports issued by Sentry); Doc. #73, Ex. 6 (Nissenbaum's W-2 filings from 2005 to 2009 listing Sentry as employer); Doc. #73, Ex. 7 (Nissenbaum's paystubs issued by Sentry); Doc. # 71, Ex. 15-17 (Nissenbaum's personnel action forms issued by Sentry). Because NHH opted not to retain Nissenbaum, she never filled out any employment paperwork with NHH or Canpartners. *See* Doc. #74, Ex. 13 (NHH's payroll register does not list Nissenbaum as an employee).

Considering the totality of the circumstances and the "economic reality" of the relationship between NHH and Nissenbaum, the Court finds that NHH was not Nissenbaum's joint employer for purposes of the FLSA. Rather, NHH was connected to Nissenbaum only insofar as it opted not to retain Nissenbaum after the change in management. This limited connection is simply not sufficient to establish the requisite employment relationship to succeed on a claim for relief under the FLSA. *See Moreau*, 356 F.3d at 951 (facts evidencing minimal control must be viewed in the context of the entire relationship). Accordingly, the Court finds that summary judgment in favor of NHH on Nissenbaum's FLSA claims is appropriate.

        **C.**    **Successor In Interest Liability**

Nissenbaum further contends that NHH is liable under the FLSA as a joint employer by virtue of its status as a successor in interest to Sentry. *See* Doc. #78, p. 12-14. Indeed, successor liability under the FLSA can attach "when 1) the subsequent employer was a bona fide successor

12

and 2) the subsequent employer had notice of the potential liability." *See Steinbach v. Hubbard*, 51 F.3d 843, 846 (9th Cir. 1995). "Whether an employer qualifies as a bona fide successor will hinge principally on the degree of business continuity between the successor and predecessor." *Id.* However, the cases that address successor liability under the FLSA envision a change in ownership from the predecessor to the successor. *See N.L.R.B. v. Jeffries Lithograph Co.*, 752 F.2d 459, 463 (9th Cir. 1985) (citing a change in ownership between predecessor and successor as the triggering event); *see also Golden State Bottling Co., Inc. v. N.L.R.B.*, 414 U.S. 168, 172 (1973) (evidence showed that third party entity purchased plaintiff business with knowledge of unfair labor practice litigation); *see also Upholsterers' Intern. Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1327 (7th Cir. 1990) (noting that "it would be inequitable to hold a successor liable when it was unable to take the liability into account in negotiating the acquisition price"). With respect to notice, the principal concern is fairness. *See Criswell v. Delta Air Lines, Inc.*, 868 F.2d 1093, 1094 (9th Cir. 1989) (quoting *Musikiwamba v. Essi, Inc.*, 760 F.2d 740, 750 (7th Cir. 1985) (explaining that it would be grossly unfair, except in the most exceptional circumstances, to impose successor liability on an innocent purchaser . . . when the successor did not have the opportunity to protect itself"). Accordingly, notice must be given prior to the transition from predecessor to successor.

While Sentry and NHH, as management companies, fulfilled virtually the same role with respect to the Cal Neva, they had absolutely no relationship such that NHH could be deemed Sentry's bona fide successor. The termination of the Sentry Management Agreement and the execution of the NHH Management Agreement do not evidence any transfer of interest from Sentry to NHH. Rather, NHH entered into a separate and distinct contract of its own with Canpartners. There is simply no indication that Sentry or Namcal was at all involved in this process. Accordingly, the Court finds that NHH cannot be deemed a bona fide successor.

Moreover, Nissenbaum failed to demonstrate that NHH had notice of her alleged grievances prior to the execution of the NHH Management Agreement. Nissenbaum cites June 8, 2009 as the

1  date on which NHH allegedly became aware of her employment related claims.  *See* Doc. #78, p.
2  14; *see also* Doc. #78, Ex. 1 (EEOC Notice of Charge of Discrimination addressed to Marcil of
3  NHH, dated June 8, 2009).  As June 8, 2009 is long after the date on which the NHH Management
4  agreement became effective or any negotiations relating thereto took place, the Court finds that
5  NHH did not have notice of any potential liability to Nissenbaum.  In sum, the Court concludes that
6  NHH may not properly be considered a joint employer on a theory of successor liability.

       **D.**       **Joint Employer Status Under the Nevada Equal Pay Act**

8  The Nevada Equal Pay Act provides that "[i]t is unlawful for any employer to discriminate
9  between employees, employed within the same establishment, on the basis of sex by paying lower
10 wages to one employee than the wages paid to an employee of the opposite sex who performs equal
11 work which requires equal skill, effort and responsibility and which is performed under similar
12 working conditions."  N.R.S. 608.017(1).  The Act defines an employer as "every person having
13 control or custody of any employment, place of employment or any employee."  N.R.S. 608.011.
14 To the extent the Nevada Equal Pay Act's definition of "employer" differs from that of the FLSA,
15 the Court finds that the inquiry is sufficiently encompassed by the framework set forth above.  The
16 aforementioned analysis demonstrates that NHH did not have the requisite control or custody over
17 Nissenbaum such that they were her employers for purposes of the Nevada Equal Pay Act.
18 Accordingly, the Court finds that summary judgment in favor of NHH on Nissenbaum's Nevada
19 Equal Pay Act claim is appropriate.

       **E.**       **Anti-Discrimination Pursuant to Title VII and NRS 613.330**

21 For the first time in her Response, Nissenbaum contends that the success of her Title VII
22 claim is not contingent on the existence of an employment relationship.  Doc. #78, p. 15.  Instead,
23 she argues, NHH is amendable to liability as non-employers for interfering with Nissenbaum's
24 employment opportunities with another employer.[6]  *Id.*  However, the FAC does not raise this as a

---

[6] Nissenbaum neglects entirely to explain how her new theory of liability applies to this case. As such, even if the Court were inclined to entertain her newly espoused theory of liability, it would

14

ground for recovery. Rather, Nissenbaum predicates her Title VII claim on "DEFENDANT EMPLOYERS' unlawful gender discrimination and unequal payment of wages based on [sic] her gender." Doc. #27, p. 15. On this basis alone, the Court declines to address Nissenbaum's newly articulated theory of liability. *See Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 991 (9th Cir. 2006) (a party may not oppose summary judgment by raising grounds not in issue under the pleadings).

Title VII provides that it is an unlawful employment practice for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to . . . terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). The statute defines an "employer" as "a person engaged in industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or proceeding calendar year[.]" 42 U.S.C. § 2000e(b). Additionally, "there must be some connection with an employment relationship for Title VII protections to apply." *Lutcher v. Musicians Union Local 47*, 633 F.2d 880, 883 (9th Cir. 1980). Here again, Courts inquire as to the "economic realities" of the situation, namely "the extent of the employer's right to control the means and manner of the worker's performance." *Adcock v. Chrysler Corp.*, 166 F.3d 1290, 1292 (9th Cir. 1999) (citing *Lutcher*, 633 F.2d at 833). As the Court already determined that the "economic realities" of Nissenbaum's relationship to NHH does not support a finding of an employment relationship, summary judgment in favor of NHH on Nissenbaum's Title VII claim is appropriate.

Similarly, Nevada Revised Statute 613.330 applies only to employers. For all of the aforementioned reasons, the Court finds that summary judgment in favor of NHH on Nissenbaum's Nevada anti-discrimination claim is appropriate.

///

be unable to do so on the basis of Nissenbaum's submission to the Court.

**F.     Punitive Damages**

Because the Court finds that Nissenbaum has not established the requisite employment relationship in order to prove her claims for compensatory damages under the FLSA, the Nevada Equal Pay Act, Title VII, and Nevada Revised Statute 613.330, she is not entitled to punitive damages.

**IV.    Conclusion**

The Court finds that Nissenbaum has produced insufficient evidence to establish that NHH was her joint employer for purposes of her equal pay and discrimination claims.  Because Nissenbaum failed to prove an employer/employee relationship as required under the FLSA, the Nevada Equal Pay Act, Title VII, and Nevada Revised Statute 613.330, the Court grants NHH's Motion for Summary Judgment as to all claims.

IT IS THEREFORE ORDERED that NHH's Motion for Summary Judgment (Doc. #72) is GRANTED.  The clerk of court shall enter judgment in favor of Defendant NHH and against Plaintiff Nissenbaum.

IT IS SO ORDERED.

DATED this 22nd day of November, 2013.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE