UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| SUSAN B. NISSENBAUM, individually, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> NNH CAL NEVA SERVICES CO., LLC, a ) <br> Delaware Limited Liability Company; ) <br> NAMCAL, LLC, a Nevada Limited Liability ) <br> Company, d.b.a., THE CAL NEVA RESORT ) <br> SPA & CASINO; NAMWEST, a Nevada ) <br> Limited Liability Company; SENTRY ) <br> HOSPITALITY OF NEVADA, a Foreign ) <br> Limited Liability Company; CANYON ) <br> CAPITAL REALTY ADVISORS, a Foreign ) <br> Corporation; CANPARTNERS REALTY ) <br> HOLDING COMPANY IV, LLC, a Delaware ) <br> Limited Liability Company; and DOES I-XX, ) <br> ) <br> Defendants. ) <br> ) | 3:11-CV-00253-LRH-WGC <br><br> ORDER |

Before the Court is Defendants Canyon Capital Realty Advisors, LLC ("Canyon Capital") and Canpartners Realty Holding Company IV, LLC's ("Canpartners") (collectively the "Canyon Entities") Motion for Summary Judgment. Doc. #69.[1] Plaintiff Susan B. Nissenbaum ("Nissenbaum") filed an Opposition (Doc. # 76), to which the Canyon Entities replied (Doc. #77).

///

---

[1] Refers to the Court's docket number.

## I. Factual Background

This case concerns Nissenbaum's employment at the Cal Neva Resort, Spa and Casino (the "Cal Neva") in Lake Tahoe, California and Nevada.

### A. Nissenbaum's Employment History

Nissenbaum began work at the Cal Neva as an employee of Sentry Hospitality of Nevada ("Sentry") on February 16, 2005. *See* Doc. #70, Ex. 11; *see also* Doc. #70, Ex. 4. At that time, the Cal Neva was owned by Namcal, LLC ("Namcal"). *See* Doc. #70, Ex. 11. Pursuant to the Management Agreement between Namcal and Sentry, dated February 15, 2005 (the "Management Agreement"), Sentry was the manager of the Cal Neva. Doc. #70, Ex. 4. In January 2008, Sentry promoted Nissenbaum from Director of Human Resources to General Manager and gave her a salary increase. *See* Doc. #71, Ex. 15. Sentry again increased Nissenbaum's salary on June 24, 2008, effective retroactively to February 1, 2008. *See* Doc. #71, Ex. 16. On February 28, 2009, Sentry replaced Nissenbaum as General Manager, moving her into the role of Hotel Manager and decreasing her salary. *See* Doc. #71, Ex. 17. Sentry's explanation for the change was as follows: "[p]roperty in receivership; Managing Director replacing GM." *Id.* Nissenbaum remained employed by Sentry at the Cal Neva until April 9, 2009. *See* Doc. #70, Ex. 10; *see also* Doc. #76, Ex. 14 (Nissenbaum Dep.), pp. 191-92; Doc. #76, Ex. 15 (Marcil Dep.), p. 114.

### B. The Canyon Entities' Relationship to the Cal Neva

On November 6, 2007, Canpartners entered into a Loan and Security Agreement (the "Loan Agreement") with Namcal, pursuant to which Canpartners made a $25,000,000 loan (the "Loan") to Namcal. Doc. #70, Ex. 1. The Loan was secured by the Cal Neva property. *See* Doc. #78, Ex. 5. Canyon Capital, as a member of Canpartners and a registered investment advisor, managed various investments on behalf of Canpartners, including the Loan. *See* Doc. #70, Ex. 2 (Bosworth Dep.), p. 31. In order to secure repayment of the Loan, Namcal executed and delivered to Canpartners various security instruments, as is customary in commercial real estate lending practice. *See* Doc. #69, p. 6; *see also* Doc. #76, p. 3. Of particular relevance here, Namcal and

Canpartners executed an Assignment of Management Agreement, Security Agreement and Subordination Recognition Agreement (the "Subordination Agreement"). Doc. #70, Ex. 3. Referenced therein is the Management Agreement between Namcal and Sentry. *See id.*

On December 9, 2008, following Namcal's default on the Loan, Canpartners recorded a Notice of Default and Election to Sell under the California Deed of Trust. *See* Doc. #69, p. 8. On December 10, 2008, Canpartners recorded a similar Notice of Default and Election to Sell under the Nevada Deed of Trust. *See id.* On December 16, 2008, Richard Bosworth ("Bosworth"), on behalf of Canpartners, visited the Cal Neva for the first time since the Loan was made to Namcal in order to inspect the property. *See id.* This was the first time that Nissenbaum met Bosworth, or any other representative from Canpartners. *See* Doc. #70, Ex. 5 (Nissenbaum Dep.), p. 133. During this December visit, Bosworth spoke with Nissenbaum about the financial condition of the Cal Neva, which she characterized as a "financial mess." *See* Doc. #70, Ex. 2 (Bosworth Dep.), p. 76. Based on Bosworth's visit and a subsequent phone call from Nissenbaum further indicating the financial decline of the Cal Neva, Canpartners sought the appointment of a receiver to oversee management and control of the Cal Neva until the time of foreclosure. *Id.* at 76-78; *see also* Doc. #76, Ex. 9 (Canpartners' Motion for Appointment of Receiver).

On February 5, 2009, Michael McPherson ("McPherson") was appointed by the Washoe County District Court to act as Receiver of the Cal Neva. Doc. #70, Ex. 6. The receivership order granted McPherson broad authority to "take possession of the [Cal Neva] and hold, manage, and maintain [it] . . . , preserving it from loss, material injury, destruction, substantial waste, or loss of income therefrom." *Id.* at 2. Additionally, the receivership order explicitly authorized McPherson to "make payroll, including employees." *Id.* Finally, the receivership order specifically authorized McPherson "[t]o borrow or otherwise receive funds from [Canpartners] . . . as may be necessary to satisfy the costs and expenses of the receivership[.]" *Id.* at 4. To that end, Canpartners made approximately seven (7) protective advances at McPherson's request during the period of receivership (from February 5, 2009 through April 9, 2009). *See* Doc. #70, Ex. 7 (emails

referencing wire transfers and Wire History Summary Reports); *see also* Doc. #76, Ex. 8 (McPherson's time log). Bosworth testified that the protective advances were necessary to preserve the value of the Cal Neva, which was the collateral for the Loan, until the foreclosure was complete and ownership changed hands. Doc. #70, Ex. 2 (Bosworth Dep.), p. 146.

On April 8, 2009, Canpartners foreclosed on the Cal Neva, and its subsidiary, Canpartners Cal Neva, became the new owner through trustee sales conducted in both California and Nevada. *Id.* at 183; Doc. #70, Ex. 8. Later that same day, pursuant to its rights under the Subordination Agreement, Canpartners terminated the Management Agreement between Namcal and Sentry, effective April 9, 2009. Doc. #70, Ex. 8. Also on April 8, 2009, Canpartners Cal Neva and NHH Cal Neva Services Co., LLC ("NHH") executed the Amended and Restated Management Agreement (the "NHH Management Agreement"), pursuant to which NHH took over management of the Cal Neva. Doc. #70, Ex. 9. On April 9, 2009, Ernie Catanzaro ("Catanzaro") of NHH sent a letter to William Jackson ("Jackson") of Sentry, then General Manager of the Cal Neva, informing him that NHH would not be retaining him or Nissenbaum. Doc. #70, Ex. 10.

### C. Procedural History

On April 3, 2009, Nissenbaum, through counsel, sent a letter to Bosworth (among others) complaining of gender discrimination, unequal pay, and demanding payment for lost wages. Doc. #71, Ex. 21. The letter was not addressed to any representative of NHH. *See id.* On April 10, 2009, Nissenbaum filed a complaint with the Nevada Equal Rights Commission, alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Equal Pay Act of 1963 ("Equal Pay Act"). *See* Doc. #27, ¶50. Nissenbaum's complaint was subsequently forwarded to the United States Equal Employment Opportunity Commission (the "EEOC"). *See id.* The EEOC ultimately terminated its investigation on both claims without issuing any findings of fact or conclusions of law. *See id.* at ¶51, ¶52. On December 20, 2011, Nissenbaum, through prior counsel, filed a First Amended Complaint ("FAC"), naming the Canyon Entities as defendants. *See id.* In the FAC, Nissenbaum alleges two causes of action—the first for equal pay discrimination in

violation of the Equal Pay Act, 29 U.S.C. § 206(d)(1), and Nevada's Equal Pay Act, N.R.S. 608.017, and the second for discrimination in violation of Title VII, 42 U.S.C. § 2000e-2, and Nevada's anti-discrimination statute, N.R.S. 613.330. *See* Doc. #27, pp. 11-16. In addition to compensatory damages, Nissenbaum also seeks punitive damages against the Canyon Entities. *See* Doc. #27, pp. 16-17. On April 15, 2013, the Canyon Entities filed the present Motion for Summary Judgment on the issue of joint employer liability. Doc. #69.

**II.      Legal Standard**

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, affidavits or declarations, stipulations, admissions, and other materials in the record show that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the initial burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001). On an issue as to which the non-moving party has the burden of proof, however, the moving party can prevail merely by demonstrating that there is an absence of evidence to support an essential element of the non-moving party's case. *Celotex*, 477 U.S. at 323.

To successfully rebut a motion for summary judgment, the non-moving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v.*

1 *Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000).  A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate.  *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983).  A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.  The mere existence of a scintilla of evidence in support of the party's position is insufficient to establish a genuine dispute; there must be evidence on which a jury could reasonably find for the party.  *See id.* at 252.

**III.   Discussion**

    **A.   Joint Employer Status Under the Fair Labor Standards Act**

The Fair Labor Standards Act ("FLSA")[2] prohibits employers from discriminating between employees on the basis of sex.  *See* 29 U.S.C. § 206(d)(1).  To succeed on a claim under the FLSA, a plaintiff must first establish the existence of an employer/employee relationship.  *See Bonnette v. Cal. Health and Welfare Agency*, 704 F.2d 1465, 1468 (9th Cir. 1983), abrogated on other grounds by *Garcia v. San Antonio Transit Auth.*, 469 U.S. 528, 539 (1985); *see also Martinez-Mendoza v. Champion Intern. Corp.*, 340 F.3d 1200, 1209 (11th Cir. 2003) (alleged employee has the burden of proving joint employment by a preponderance of the evidence).  The FLSA defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).  The FLSA defines an "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1).  Under the FLSA, two or more employers may employ a person jointly.  *Bonnette*, 704 F.2d at 1469; 29 C.F.R. § 791.2(a).  Where joint employment is found, each joint employer is individually responsible for violations of the FLSA with respect to the entire employment.  *Valdez v. Cox Communications Las Vegas, Inc.*, No. 2:09-CV-01797-PMP-RJJ, 2012 WL 1203726, at *1 (D. Nev. April 11, 2012) (citing *Bonnette*, 704 F.2d at 1469; 29

---

[2] The FLSA encompasses the Equal Pay Act.  *See generally* 29 U.S.C. § 206.

1   C.F.R. § 791.2(a)).  "A fundamental principle behind the joint employment doctrine is that a
2   worker may be employed by more than one entity at the same time." *Guifu Li v. A Perfect Day*
3   *Franchise, Inc.*, 281 F.R.D. 373, 400 (N.D. Cal. 2012) (citing *Bonnette*, 704 F.2d at 1469;
4   *Gilbreath v. Cutter Biological, Inc.*, 931 F.2d 1320, 1324 (9th Cir. 1991)).

5      The Court applies an "economic reality" test to determine whether a joint employment
6   relationship exists. *Torres-Lopez v. May*, 11 F.3d 633, 638 (9th Cir. 1997).  Among the factors the
7   Court considers most relevant when evaluating the economic reality of an alleged joint employment
8   relationship are "whether the alleged employer (1) had the power to hire and fire employees,
9   (2) supervised and controlled employee work schedules or conditions of payment, (3) determined
10  the rate and method of payment, and (4) maintained employment records," (collectively referred to
11  as the "*Bonnette* factors").  *Moreau v. Air France*, 356 F.3d 942, 946-47 (9th Cir. 2004) (quoting
12  *Bonnette*, 704 F.2d at 1470).  However, no single factor is dispositive—the Court may ultimately
13  conclude that there was no joint employment, even where some factors weigh in favor of finding
14  joint employment. *Zheng*, 355 F.3d at 76.  "Ultimately, the determination is 'based upon the
15  circumstances of the whole activity.'" *Valdez*, 2012 WL 1203726, at *2 (quoting *Bonnette*, 704
16  F.2d at 1470).

17     Whether a party is an employer for purposes of FLSA liability is a question of law,
18  appropriate for resolution by the Court on motion for summary judgment. *See Torres-Lopez*, 111
19  F.3d at 638.  In order to find no joint employment at the summary judgment stage, the Court
20  "would have to conclude that, even where both the historical facts and the relevant factors are
21  interpreted in the light most favorable to the plaintiffs, defendants are still entitled to judgment as a
22  matter of law." *Zheng*, 355 F.3d at 76.

23     Nissenbaum admits, and the Canyon Entities do not dispute, that she was employed by
24  Sentry. *See* Doc. #69, Ex. 22, ¶1; Ex. 23, ¶1; *see also* Doc. #69, p. 20.  However, she also asserts
25  that both Namcal and Canpartners were her joint employers by virtue of the Management
26  Agreement (Doc. #70, Ex. 4) and the Subordination Agreement (Doc. #70, Ex. 3). *See* Doc. #76, p.

15. Specifically, Nissenbaum avers that Canpartners had certain authority under the Management Agreement with regard to her employment as a result of the Subordination Agreement. Doc. #76, p. 4. To this end, she argues, Namcal's status as a joint employer "is a crucial step in the analysis of 'joint employment,' as it applies to [the Canyon Entities]." Doc. #76, p. 10.

However, while Nissenbaum asserts generally that "Canpartners had economic control over [] Nissenbaum by virtue of its legal relationship with Namcal and Sentry, at least from the time it initiated foreclosure proceedings until [] Nissenbaum was fired by Canpartners' management company" (Doc. #76, p. 9), she fails to refute the Canyon Entities' detailed analysis of the joint employment issue or provide sufficient evidentiary support for her contentions. *See* Fed. R. Civ. P. 56(e) (stating that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the [C]ourt may: . . . (2) consider the fact undisputed for purposes of the motion"); *see also* Local Rule 56-1 (requiring litigants opposing a motion for summary judgment to provide a "concise statement setting forth each fact material to the disposition of the motion"). Instead, Nissenbaum cites a number of allegedly controverted facts that she claims preclude summary judgment. *See* Doc. #76, pp. 8-10.

The Court, however, disagrees with Nissenbaum's characterization of these facts as "disputed." The parties do not dispute the material facts on which the joint employer analysis turns. Rather, the parties dispute the extent to which these facts demonstrate that the Canyon Entities were Nissenbaum's joint employer. Insofar as there are disputed facts—e.g., whether and how Nissenbaum was verbally informed that she would not be retained by NHH on April 9, 2009,[3] and whether NHH took over management of the Cal Neva on April 9, 2009 or April 10, 2009[4]—the

---

[3] Nissenbaum contends that Catanzaro and Robert Marcil ("Marcil") "terminated" her employment on April 9, 2009. Doc. #70, Ex. 5 (Nissenbaum Dep.), pp. 191-92. Marcil does not recall a meeting with Nissenbaum on April 9, 2009. Doc. #76, Ex. 15 (Marcil Dep.), p. 114.

[4] Bosworth went to great lengths in his deposition to explain that NHH took over management of the Cal Neva at midnight on the morning of April 10, 2009, as was common in the 24-hour hotel industry. Doc. #70, Ex. 2 (Bosworth Dep.), pp. 180-82. In her Opposition, Nissenbaum disputes

8

Court finds that they are immaterial to a determination of whether the Canyon Entities were Nissenbaum's joint employers. *See Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)) ("substantive law determines which facts are material; only disputes over facts that might affect the outcome of the suit under the governing law properly preclude the entry of summary judgment"). As there are no genuinely disputed issues of material fact, the issue of whether the Canyon Entities were Nissenbaum's joint employer under the aforementioned framework is properly before the Court.

### B.   The *Bonnette* Factors as Applied to the Canyon Entities

####   (i)   The Power to Hire and Fire

Section 4.2 of the Sentry Management Agreement expressly provides:

> Employees. (a) [Namcal] hereby grants to Sentry the right to hire, promote, discharge and supervise the work of management staff (i.e., the hiring of the assistant managers and department heads) as well as all other operating and service employees performing services in or about the Hotel/Resort (other than spa and casino employees), all in Sentry's name or in the name of Sentry's Affiliate. All Executive Committee Members shall be employees of Sentry. [Namcal] retains the right to approve the hiring and/or termination of the general manager and controller.

Doc. #69, Ex. 4, p. 14. Pursuant to these terms, Sentry had the exclusive authority over hiring and termination decisions and Namcal retained only the limited right to approve the hiring and termination of the general manager and controller. *See id.*

Nissenbaum argues that the Subordination Agreement ultimately bestowed Namcal's rights with respect to hiring and termination onto Canpartners, thereby making it her joint employer. *See* Doc. #27, ¶¶22, 35. Section 1 of the Subordination Agreement states:

> [Namcal] hereby assigns the Management Agreement to [Canpartners] to secure the payment and performance of the obligations contained in the Loan Documents and [Namcal] hereby transfers and assigns to [Canpartners], and its successors and assigns, all of [Namcal's] rights arising under the Management Agreement, as now existing and as the same may from time to time be supplemented, modified or amended and [Sentry]

---

Bosworth's version of the facts, instead arguing that NHH took over management of the Cal Neva on April 9, 2009. *See* Doc. #76, at p. 9.

9

> hereby acknowledges and consents to such assignment. Neither this Agreement nor any action or actions on the part of [Canpartners] shall constitute an assumption by [Canpartners] of any of [Namcal's] obligations under the Management Agreement unless and until [Canpartners] shall have given written notice to [Sentry] of its election to exercise the right of [Namcal] under the Management Agreement following an event of default under any of the Loan Documents. . . .  Prior to such notice, (I) [Namcal] shall continue to be liable for all of its obligations under the Management Agreement and [Namcal] hereby agrees to perform each and all of such obligations, and (ii) [Sentry] shall continue to fulfill its obligations to [Namcal] under the terms of the Management Agreement. . . . [Canpartners] shall have no liability for any failure to such person or entity to perform the obligations under the Management Agreement.

The Court finds that the aforementioned provisions—interpreted in the light most favorable to Nissenbaum—suggest, at most, that Canpartners had limited authority to approve of Sentry's decision to hire and/or terminate Nissenbaum in her role as General Manager. In doing so, the Court finds determinative the fact that the Subordination Agreement distinguishes between Namcal's "rights arising under the Management Agreement" and it's "obligations under the Management Agreement." Contrary to the Canyon Entities' assertion, only the assumption of Namcal's obligations was contingent upon Namcal's default and Canpartners' written notice of its election to assume Namcal's obligations under the Management Agreement. Namcal's rights, on the other hand, were assigned to Canpartners immediately upon execution of the Subordination Agreement. One such right that Namcal transferred and assigned to Canpartners in executing the Subordination Agreement was the "right to approve the hiring and/or termination of the general manager and controller."

Nevertheless, at the time of her termination, Nissenbaum was in the position of Hotel Manager, not General Manager. Doc. #71, Ex. 17. Accordingly, neither Namcal nor Canpartners had any right to approve her termination at that time. According to the Management Agreement, only Sentry had that right. Moreover, the record is devoid of any indication that Canpartners ever elected to exercise the limited authority it had to approve of Sentry's hiring and/or firing determinations. There is nothing in the record to indicate that Canpartners approved or disapproved of Nissenbaum's promotion to General Manager in January 2008. Nor is there anything in the record to indicate that Canpartners played any role in approving or disapproving of

Nissenbaum's demotion to Hotel Manager in February 2009. *See* Doc. #69, Ex. 17 (citing the fact that the property was in receivership as the explanation for the change in management); *see also* Doc. # 69, Ex. 2 (Bosworth Deposition), p. 104 (stating that the Canyon Entities were never apprised of any changes in management).

Following the foreclosure proceedings on April 8, 2009, Canpartners terminated the Management Agreement between Namcal and Sentry, effective April 9, 2009. Doc. #70, Ex. 8. The Subordination Agreement explicitly gave Canpartners the right to terminate Sentry as the hotel management company upon a loan default by Namcal. Specifically, Section 5 provides, in relevant part:

> Notwithstanding anything to the contrary contained in the Management Agreement, this Agreement or otherwise, in the event [Canpartners] becomes the owner of the Property, whether in its own name, through its nominee, or otherwise, or if the Property is acquired by any purchaser (the "Purchaser"), pursuant to any right or remedy under the Loan Documents, by deed or assignment in lieu of such remedies or otherwise, (a "Termination Event"), then [Canpartners] shall have the right to elect at its sole option for any reason or no reason whatsoever, at any time upon and for the period ninety (90) days following such Termination Event, to terminate the Management Agreement upon written notice (the "Termination Notice") to [Sentry]. The effective date of such termination shall be the date specified by [Canpartners] or the Purchaser in the Termination Notice . . . ."

Accordingly, Nissenbaum's employment by Sentry at the Cal Neva was automatically terminated on April 9, 2009.[5] Thereafter, Canpartners and NHH executed the Amended Management Agreement, effective April 8, 2009. Doc. #70, Ex. 9. NHH, as the new management company, opted not to retain Nissenbaum as an employee. *See* Doc. #70, Ex. 10. As such, Nissenbaum was never hired as an employee of either NHH or Canpartners. The Canyon Entities did not terminate Nissenbaum or any other Sentry employees. *See* Doc. #70, Ex. 2, p. 130. Finally, Nissenbaum appears to concede that she was never an employee of the Canyon Entities—she testified that had she been hired by the Canyon Entities, she would not have pursued her claims

---

[5] This is not to say that Nissenbaum's employment with Sentry was automatically terminated. Rather, because Sentry no longer managed the Cal Neva, Nissenbaum no longer had employment with Sentry there either.

against them. *See* Doc. #70, Ex. 5, p. 157.

>  (ii) <u>Supervision and Control Over Employee Work Schedules or Conditions of Payment</u>

First, the Management Agreement and the Subordination Agreement did not vest the Canyon Entities with the authority to supervise or control Sentry's employee's work schedules or the conditions of their payment. Nissenbaum asserts that "[a]s of the date the Subordination Agreement was signed, Canpartners had ongoing control over the management and operation of the Cal Neva." Doc. #76, p. 4-5. However, Section 4.2 of the Management Agreement explicitly granted Sentry the exclusive right "to supervise the work of management staff . . . as well as all other operating and service employees performing services in or about the [Cal Neva]." Doc. #67, Ex. 4. Section 4.8 further provides that "[a]ny right of [Namcal] to approve any aspect of services hereunder shall be only to assure that the obligations and provisions of the [Management Agreement] are complied with and that [Namcal's] expenditures hereunder are not unlimited, and shall not be, or be deemed to be, for the purpose of controlling the methods and manner of performance of the service of Sentry." Doc. #67, Ex. 4. Namcal simply did not have the right to control the "methods and manner" by which Sentry managed the Cal Neva. Nor did Namcal have the right to supervise and control Sentry's employees. Those rights belonged exclusively to Sentry. *See Gilbreath v. Cutter Biological, Inc.*, 931 F.2d 1320, 1326-27 (finding that defendant was not a joint employer of inmate workers where the contract between defendant and the department of corrections vested ultimate supervisory authority with the state). And because Namcal did not have these rights pursuant to the Management Agreement, it follows that the Canyon Entities did not have these rights pursuant to the Subordination Agreement.

Second, Nissenbaum has presented no evidence that the Canyon Entities actually supervised or controlled her work schedule or conditions of remuneration. Instead, the evidence strongly suggests that the Canyon Entities played absolutely no role in supervising or controlling Nissenbaum's employment whatsoever. As to supervision, Nissenbaum did not report to the

Canyon Entities regarding her job responsibilities.  Doc. #70, Ex. 5 (Nissenbaum Deposition), p. 165.  The Canyon Entities did not give Nissenbaum job assignments or direct her day-to-day activities.  *Id.* at 165.  The Canyon Entities did not complete any written evaluations of Nissenbaum.  *Id.* at 165-66.  Nissenbaum never negotiated her salary with the Canyon Entities or any representative on their behalf.  *Id.* at 166.  Nor did the Canyon Entities ever have any involvement in the payroll process.  *Id.* at 171-72.  Nissenbaum did not complain about the hours she was working or her salary to Bosworth or any other Canyon Entities representative.  *Id.* at 149, 166-67.  Finally, Nissenbaum admits that Bosworth, the only person from the Canyon Entities with whom she can recall having contact, was never her supervisor.  *Id.* at 166.

       Still, however, Nissenbaum contends that "the facts show" that Canpartners had economic control over Nissenbaum by virtue of its legal relationship with Namcal and Sentry, "at least from the time it initiated foreclosure proceedings until [] Nissenbaum was fired by Canpartners' management company."  Doc. #76, p. 9.  Nissenbaum further claims that "[w]hen Namcal defaulted on the loan from Canparterns in November 2008, Canpartners worked closely with the Receiver . . . to participate in the management and operation of the Cal Neva."  Doc. #76, p. 5.  In support of these contentions, Nissenbaum cites the protective advances from Canyon Capital (at least one of which was used for the express purpose of meeting the Cal Neva's payroll), McPherson's regular reports on the Cal Neva's finances and operation to Canpartners through Bosworth, and Bosworth's emails inquiring as to the Cal Neva's operations and maintenance as proof that the Canyon Entities had a "direct effect on the management of the property, and employment at the Cal Neva."  Doc. #76, p. 5; *see also* Doc. #76, Ex. 8 (McPherson's time log during the period of receivership at the Cal Neva); Doc. #76, Ex. 11 (email from Bosworth to Nissenbaum, inquiring as to whether employees are "California or Nevada" and what payroll system is used, as well as various other emails, of which Nissenbaum is not a part, that address what appear to be maintenance issues).

///

The Court, however, finds that none of the evidence to which Nissenbaum cites serves to demonstrate that the Canyon Entities exercised any control whatsoever over Nissenbaum. At most, this evidence supports a finding that McPherson, not the Canyon Entities, had authority to manage, operate, protect, and preserve the Cal Neva in accordance with the court order appointing him. *See* Doc. #70, Ex. 6 (order authorizing McPherson to, among other things, take possession of, manage, operate, protect, and preserve the Cal Neva; to take possession of all accounts, including bank accounts; to incur expenses necessary and prudent for the care, preservation, and maintenance of the Cal Neva; to cause the property to be repaired and maintained, and in connection therewith, to oversee the Property; to make payroll, including employees, security, maintenance personnel, and other persons; to hire or employ any other person or entity to act as agent, clerk, property manager, or otherwise needed to administer the Cal Neva and the receivership estate and to pay reasonable and customary rates for those services; to hire or employ or contract with any person or entity qualified to operate and manage the Cal Neva). The fact that the Canyon Entities provided the funds necessary to enable McPherson to accomplish the aforementioned court-ordered tasks, including making payroll, simply does not support Nissenbaum's contention that the Canyon Entities supervised or controlled her employment. *See* Doc. #70, Ex. 5 (court order authorizing the Canyon Entities to disburse to the Receiver all sums necessary for the operation, maintenance, preservation, and security of the Cal Neva)*; see also Guifu Li v. A Perfect Day Franchise, Inc.*, 281 F.R.D. 373, 399 (N.D. Cal. 2012) ("even though there is evidence that Schriner provided financing to Perfect Day, there is no evidence that this funding in any way impacted the employment relationship"). Moreover, Nissenbaum neglects to explain how any involvement that the Canyon Entities may have had in the management of the Cal Neva, via communication with McPherson, proves that the Canyon Entities had control over her employment.

Nevertheless, Nissenbaum is convinced "that by virtue of the fact that [the Canyon Entities] were providing funding to the receiver for the property, that [Bosworth] had some control of [her] salary." Doc. #70, Ex. 5, p 170. She complains that "[a]lthough Canpartners argued in favor of its

14

vast authority with respect to the Cal Neva in the receivership action, it has downplayed and recharacterized its authority in this proceeding." Doc. #76, p. 10.  However, Nissenbaum fails to appreciate the distinction between Canpartners' contractual and statutory entitlement to the appointment of a receiver in the event of default and the Canyon Entities absence of authority to operate and manage the Cal Neva itself prior to foreclosure proceedings.  *See* Doc. #76, Ex. 9, p. 14 (citing Section 5(b) of the Nevada Assignment Agreement and Section 10.3 of the Nevada Deed of Trust providing that Canpartners shall be entitled to the appointment of a receiver for all or any part of the Cal Neva in the event of Namcal's default).  The fact that Canpartners had the right to obtain a court-appointed receiver following Namcal's default in no way bestowed Canpartners with the authority to take over the operation and management of the Cal Neva.  Indeed, if Canpartners had the authority to take over management of the Cal Neva at the time of Namcal's default, it would not have sought the appointment of a receiver in the first place.  Furthermore, Nissenbaum misunderstands the purpose and role of a receiver.  Under Nevada law, a receiver is an officer of the court who exercises duties to protect and preserve the interests of *all parties* to the litigation.  *See Lynn v. Ingalls*, 100 Nev. 115, 120 (1984).  Accordingly, Nissenbaum's assertion that McPherson was somehow acting at the behest of the Canyon Entities to control Nissenbaum's employment is entirely misplaced.

Finally, the date on which the Canyon Entities began searching for a management company to replace Sentry has no bearing on the Court's analysis.  Indeed, the evidence indicates that Canpartners was in contact with NHH and others in preparation for the transition in management before the date on which NHH officially took over management of the Cal Neva.  *See* Doc. #76, Ex. 12; Doc. #76, Ex. 13; Doc. #76, Ex. 14 (Nissenbaum Dep.), pp. 189-90 (testifying as to an encounter with Marcil, human resources representative from NHH, on April 9, 2009, in which he asked Nissenbaum where to find certain things and other questions about the property); *see also* Doc. #70, Ex. 2 (Bosworth Dep.), pp. 185-86 (testifying that NHH began working for the Canyon Entities on April 8, 2009, in anticipation of its assignment to the Cal Neva, but noting also that

1  NHH did not run the property at that time). Bosworth went to great lengths to explain in his
2  deposition that "you can have a management agreement in place with a hotel management company
3  90 days before they take over . . . because they're going to be preparing." Doc. #70, Ex. 2
4  (Bosworth Dep.), pp. 185-86. The fact that NHH, by virtue of the NHH Management Agreement
5  with the Canyon Entities, was preparing for this transition in management simply does not indicate
6  that either NHH or the Canyon Entities exercised any supervision or control over Nissenbaum
7  during that time. Finally, Nissenbaum's averment that "[t]he evidence shows NHH was hard at
8  work on the Cal Neva as early as April 3, 2009" is misleading at best. The email to which
9  Nissenbaum refers as "evidence" is between two NHH employees regarding general questions to
10 ask at some future time. *See* Doc. #76, Ex. 13. It has nothing to do with Nissenbaum and certainly
11 does not substantiate her assertion that the Canyon Entities or NHH had any supervisory or
12 economic control over her employment at that time. *See id.*

13                           (iii)   Determination of the Rate and Method of Payment

14       Again, the evidence clearly reflects that the Canyon Entities played absolutely no role in
15 determining the rate and method of Nissenbaum's compensation. Each of Nissenbaum's paystubs
16 in the 2008 calendar year, as well as her final paystub dated April 9, 2009, identifies Sentry as her
17 employer and Paychex, Inc. as the third-party payroll company used by Sentry for payroll
18 processing. *See* Doc. #71, Ex. 14. Additionally, Compensation Reports from January 1, 2006,
19 through April 17, 2009, show Sentry as Nissenbaum's employer. *See* Doc. #70, Ex. 12.
20 Nissenbaum's W-2 forms from this time period also reflect that Sentry was her employer. *See* Doc.
21 #70, Ex. 13.

22       Nor does Nissenbaum present any other evidence to establish that the Canyon Entities were
23 at all involved in the changes to her positions or salary while employed at the Cal Neva. Rather,
24 the Personnel Action Forms documenting Nissenbaum's promotions and demotions, and the
25 accompanying changes to her salary, were in the name of and issued by Sentry. *See* Doc. #71, Ex.
26 15 (documenting Nissenbaum's promotion to General Manager and increase in pay rate); Doc. #71,

16

Ex. 16 (documenting a retroactive salary increase); Doc. #71, Ex. 17 (documenting Nissenbaum's demotion to Hotel Manager and decrease in pay rate). Moreover, Bosworth testified that neither of the Canyon Entities were ever notified of or consulted as to any changes to Nissenbaum's title or salary. *See* Doc. #70, Ex. 2 (Bosworth Dep.), pp. 104, 127.

Finally, Nissenbaum admits that the Canyon Entities played no role in setting or negotiating her salary. *See* Doc. #70, Ex. 5 (Nissenbaum Dep.), p. 166. Her first and only communication with the Canyon Entities concerning the alleged disparity in her pay as General Manager was a demand letter sent by her attorney to Bosworth and various other individuals on April 3, 2009. *See* Doc. #71, Ex. 24, Ans. 3 and 4. In contrast, Nissenbaum had multiple communications with representatives from Sentry regarding her pay as General Manager "[t]hroughout the period of January 14, 2008 to April 9, 2009 (verbal, email)." Doc. #71, Ex. 24, Ans. 11.

    (iv) <u>Maintenance of Employee Records</u>

Finally, the record is entirely devoid of any evidence that the Canyon Entities or NHH kept any records related to Nissenbaum's employment during her tenure at Cal Neva. Rather, all of Nissenbaum's employment records during the relevant period were maintained by either Namcal or Sentry. *See* Doc. #70, Ex. 11 (Nissenbaum's application for employment with Namcal); Doc. #70, Ex. 12 (Nissenbaum's compensation reports issued by Sentry); Doc. #70, Ex. 13 (Nissenbaum's W-2 filings from 2005 to 2009 listing Sentry as employer); Doc. #71, Ex. 14 (Nissenbaum's paystubs issued by Sentry); Doc. 71, Ex. 15-17 (Nissenbaum's personnel action forms issued by Sentry). Because NHH opted not to retain Nissenbaum, she never filled out any employment paperwork with NHH or the Canyon Entities. *See* Doc. #71, Ex. 19 (NHH's payroll register does not list Nissenbaum as an employee). Additionally, Nissenbaum admits that she never received any written evaluations from Bosworth or anyone else associated with the Canyon Entities. Doc. #70, Ex. 5, p. 165-66.

Considering the totality of the circumstances and the "economic reality" of the relationship between the Canyon Entities and Nissenbaum, the Court finds that the Canyon Entities were not

Nissenbaum's joint employer for purposes of the FLSA.  Rather, the Canyon Entities were connected to Nissenbaum only insofar as they were a commercial real estate lender to Namcal. That relationship was entirely consistent with the type of control that a secured creditor legitimately may exercise over a defaulting debtor to protect the collateral property securing the loan.  This limited connection is simply not sufficient to establish the requisite employment relationship to succeed on a claim for relief under the FLSA.  *See Moreau*, 356 F.3d at 951 (facts evidencing minimal control must be viewed in the context of the entire relationship).  Accordingly, the Court finds that summary judgment in favor of the Canyon Entities on Nissenbaum's FLSA claims is appropriate.

### C.   Joint Employer Status Under the Nevada Equal Pay Act

The Nevada Equal Pay Act provides that "[i]t is unlawful for any employer to discriminate between employees, employed within the same establishment, on the basis of sex by paying lower wages to one employee than the wages paid to an employee of the opposite sex who performs equal work which requires equal skill, effort and responsibility and which is performed under similar working conditions." N.R.S. 608.017(1).  The Act defines an employer as "every person having control or custody of any employment, place of employment or any employee." N.R.S. 608.011. To the extent the Nevada Equal Pay Act's definition of "employer" differs from that of the FLSA, the Court finds that the inquiry is sufficiently encompassed by the framework set forth above.  The aforementioned analysis demonstrates that the Canyon Entities did not have the requisite control or custody over Nissenbaum such that they were her employers for purposes of the Nevada Equal Pay Act.  Accordingly, the Court finds that summary judgment in favor of the Canyon Entities on Nissenbaum's Nevada Equal Pay Act claim is appropriate.

### D.   Anti-Discrimination Pursuant to Title VII and NRS 613.330

For the first time in her Response, Nissenbaum contends that the success of her Title VII claim is not contingent on the existence of an employment relationship.  Doc. #76, p. 14.  Instead, she argues, the Canyon Entities are amendable to liability as non-employers for interfering with

Nissenbaum's employment opportunities with another employer.[6] *Id.* However, the FAC does not raise this as a ground for recovery. Rather, Nissenbaum predicates her Title VII claim on "DEFENDANT EMPLOYERS' unlawful gender discrimination and unequal payment of wages based on [sic] her gender." Doc. #27, p. 15. On this basis alone, the Court declines to address Nissenbaum's newly articulated theory of liability. *See Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 991 (9th Cir. 2006) (a party may not oppose summary judgment by raising grounds not in issue under the pleadings).

Title VII provides that it is an unlawful employment practice for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to . . . terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). The statute defines an "employer" as "a person engaged in industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or proceeding calendar year[.]" 42 U.S.C. § 2000e(b). Additionally, "there must be some connection with an employment relationship for Title VII protections to apply." *Lutcher v. Musicians Union Local 47*, 633 F.2d 880, 883 (9th Cir. 1980). Here again, Courts inquire as to the "economic realities" of the situation, namely "the extent of the employer's right to control the means and manner of the worker's performance." *Adcock v. Chrysler Corp.*, 166 F.3d 1290, 1292 (9th Cir. 1999) (citing *Lutcher*, 633 F.2d at 833). As the Court already determined that the "economic realities" of Nissenbaum's relationship to the Canyon Entities do not support a finding of an employment relationship, summary judgment in favor of the Canyon Entities on Nissenbaum's Title VII claim is appropriate.

Similarly, Nevada Revised Statute 613.330 applies only to employers. For all of the aforementioned reasons, the Court finds that summary judgment in favor of the Canyon Entities on

---

[6] Nissenbaum neglects entirely to explain how her new theory of liability applies to this case. As such, even if the Court were inclined to entertain her newly espoused theory of liability, it would be unable to do so on the basis of Nissenbaum's submission to the Court.

Nissenbaum's Nevada anti-discrimination claim is appropriate.

### D. Punitive Damages

Because the Court finds that Nissenbaum has not established the requisite employment relationship in order to prove her claims for compensatory damages under the FLSA, the Nevada Equal Pay Act, Title VII, and Nevada Revised Statute 613.330, she is not entitled to punitive damages.

### IV. Conclusion

The Court finds that Nissenbaum has produced insufficient evidence to establish that the Canyon Entities were her joint employer for purposes of her equal pay and discrimination claims. Because Nissenbaum failed to prove an employer/employee relationship as required under the FLSA, the Nevada Equal Pay Act, Title VII, and Nevada Revised Statute 613.330, the Court grants the Canyon Entities' Motion for Summary Judgment as to all claims.

IT IS THEREFORE ORDERED that the Canyon Entities' Motion for Summary Judgment (Doc. #69) is GRANTED. The clerk of court shall enter judgment in favor of Defendants Canyon Capital and Canpartners, and against Plaintiff Nissenbaum.

IT IS SO ORDERED.

DATED this 22nd day of November, 2013.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE